# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

CELESTE MARTIRES       :
     plaintiff           :
                  :
        v.               :         3:05-cv-1371 (CFD)
                  :
STATE OF CONNECTICUT      :
DEPT. OF TRANSPORTATION,    :
     defendant        :

## RULING ON MOTION FOR SUMMARY JUDGMENT

Celeste Martires brought this action against her employer, the Connecticut Department of Transportation ("DOT"), for alleged violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq. (Count One) and 42 U.S.C. § 1981 (Count Two), as well as for negligent and intentional infliction of emotional distress (Counts Three and Four) and negligent supervision (Count Five). The DOT has submitted a motion for summary judgment, which the Court grants for the following reasons.

I.     Background[1]

Martires, a black woman of Hispanic origin, began working for the DOT in 1989. In June of 2003, the DOT experienced a staff reduction of 77 percent as the result of an Early Retirement Incentive Program ("ERIP"). Martires claims that the period that followed was marked by

---

[1] The following facts are taken from the parties' Local Rule 56(a) statements, summary judgment briefs, and other evidence submitted by the parties. They are undisputed unless otherwise indicated.

disorganization and dysfunction within the DOT.

A.      Martires's position during the relevant time period

As part of the reorganization following the ERIP, Martires was assigned to split her time between her old position–working as a Processing Technician in the Fiscal Unit – and the Regulatory and Compliance Unit of the DOT.  In the Regulatory and Compliance Unit, Martires worked as License and Applications Analyst (LAA).

The LAA position required a greater level of skill than the Processing Technician position, and had a correspondingly higher "service class" and pay level.  Martires's employment history record for this period indicates "temporary service in a higher class."  Martires eventually began working as an LAA full-time and her employment history indicates that her "temporary service in a higher class" was made permanent on November 28, 2003.  In the fall of 2003, Martires filed a reclassification grievance.  On February 11, 2004, Martires's reclassification grievance was granted, but she was not reclassified until April 14, 2004, after final approval was obtained from the Office of Management and Policy.  Martires' pay was adjusted retroactively at this point.

Martires had a number of different supervisors in rapid succession in her position as an LAA.  In August 2003, Martires's first supervisor, Kenneth Gambardella, was removed because of complaints from other employees.

1.      Conflict between Laila Mandour and Martires

In September 2003, Laila Mandour, a white female, was assigned to supervise Martires.  Although Mandour may have facilitated Martires' reclassification as an LAA by (for example) discussing the reclassification with a personnel representative on December 4, 2003, conflict

between Mandour and Martires quickly developed.  Among other things, Mandour and Martires had disagreements regarding Martires's request to change her work schedule to accommodate her childcare responsibilities, and changes Mandour made to Martires's time slips.  Martires also did not like working for Mandour because (1) Martires felt that Mandour favored a colleague, Abigail Rivera, a non-black Hispanic woman; (2) Mandour criticized Martires for socializing in the office; (3) Mandour criticized Martires's work and efficiency; (4) Mandour limited the amount of overtime Martires could work; (5) Mandour did not give Martires adequate notice of meetings; and (6) Mandour was careless with checks.  Although Martires felt overworked as a result of the staffing shortages in the DOT, she was upset that Mandour transferred some of Martires's job responsibilities to other employees.  According to Martires, these duties were required for promotion.

On According to Martires, on May 10, 2004, Mandour called Martires into her office, closed the door and told Martires that she was close friends with Wanda Sheldon, the acting head of personnel and that Sheldon would protect Mandour if Martires made any allegations against her. Then, Mandour told Martires that she was upset that Abigail Rivera - a co-worker - was pregnant, that her therapist had instructed Mandour "to stay away from Abigail Rivera," and "that she loved women."  Martires alleges that Mandour then told her she wanted to perform oral sex act on Martires, using a Spanish slang expression.  According to Martires, she was humiliated by the incident and, at the time, told only a few close friends and her pastor.  Martires was hospitalized because of stress that day.

On May 18, 2004, Martires indicated that she could not work with Mandour because of "unfair treatment and harassment."  In particular, Martires referred to an incident involving an

"unsecured unprocessed check."   On May 25, 2004, Martires was again hospitalized because of stress.

On June 17, Martires repeated her request to leave work because she was "unable to endure the stress, strain and unfair treatment by Ms. Mandour."  On June 23 and 28, Martires's doctor sent medical notes to the DOT indicating that Martires should no longer be supervised by Mandour.  Martires did not inform any of her supervisors of the alleged sexual proposition at this point.  Because of these requests, Judith Almeida was assigned to supervise Martires at the end of June 2004.

On August 30, 2004, Martires complained that Mandour continued to interact with her in the workplace, in violation of her doctor's orders.  On September 1, 2004, Vicky Arpin, who worked in the human resources department, notified Martires that the DOT could not ensure that she would have no workplace contact with Mandour.  Arpin placed Martires on medical leave.  Martires submitted an additional note from her doctor clarifying her restrictions, but Arpin concluded that the accommodation proposed by Martires was unreasonable.  Martires exhausted her sick and personal leave time during this period.

Later in September 2004, Martires's doctor submitted an additional note indicating that "I did not remove Celeste Martires from work on 9-1-04.  She has been and will be able to perform all her duties as previously performed as long as she is not upset by Ms. Mandour."  Martires was permitted to return to work on September 24, 2004.  Martires filed a grievance requesting that leave time exhausted during this period be restored, but the grievance was denied.  According to Martires, during this period, white men suspected of wrongdoing were placed on paid administrative leave before being discharged.

Following Martires's return to work, Mandour continued to come to her work area. According to Martires, Mandour would "get very close to [her], such as squeezing by [Martires] at her desk and rubbing up against [her]." In response to Martires's complaints, Almeida sent an e-mail to DOT staff, including Mandour, asking them to go around Martires's desk rather than physically touching her.

Martires filed a complaint dated October 22, 2004 with the Connecticut Commission on Human Rights and Opportunities ("CHRO"). The CHRO received the complaint on October 25 and forwarded it to the DOT on October 28. This complaint alleged that DOT and Mandour created a hostile work environment through a variety of actions occurring between June 2, 2003 and September, 2004. The complaint referred to the May 2004 sexual proposition only obliquely, saying "[Martires was] verbally sexually harassed by Ms. Mandour."

On October 25, 2004, Martires submitted a "duties questionnaire" outlining her work experience and job duties. Dennis King, a black male, had become Martires's supervisor on October 1, 2004 because of a reorganization within the DOT. At about this time, King sought approval from his supervisor, Michael Sanders, to hire an additional LAA and a License and Applications Specialist ("LAS") or supervising LAA. According to King, if Sanders had approved the proposal, Martires could have applied for the LAS position, or used the "duties questionnaire" as a basis for seeking reclassification into this position. However, Sanders rejected the proposal, so there was no LAS opening for which Martires could apply at that time.

Martires alleges that on October 26, 2004, Mandour purposefully "rubbed up against me an[d] touched my ass" and then "bumped me in the back." Martires reported the incident to King and Sanders. On October 27, 2004, Martires was interviewed by an Affirmative Action Officer

for the State of Connecticut.  On October 29, 2004, Martires filed a written complaint with DOT concerning both the bumping and the touching.  In this complaint she reported the May 2004 sexual proposition for the first time.  Martires also reported the bumping incident to the State Police, who investigated the incident and concluded that no criminal conduct occurred.  Martires did not file another CHRO complaint relating to the October 26 incident.

The Equal Opportunity and Diversity Office ("EODO") of the DOT investigated both incidents and concluded that even if the incidents occurred they were not sufficiently severe, extreme or pervasive to constitute sexual harassment.  The EODO recommended that Martires and Mandour remain separated.

Martires alleges that on November 23, 2004 Mandour walked into Martires and hit Martires with her shoulder.  Martires notified the Newington Police and King but her report to the DOT's Office of Equal Opportunity and Diversity was delayed until February, 2005.  She did not submit a CHRO complaint regarding the November 23, 2004 incident.  After fact-finding hearings, Mark Neri, a DOT employee, issued a report concluding that Mandour did not bump Martires.  Nevertheless, on March 8, 2005, Mandour and Martires were directed "to limit your contact in the work place while continuing to perform the duties assigned to you."

However, Martires testified in her deposition in this case that Mandour came into Martires's work area and spoke to her on several occasions.  According to Martires, Mandour would say "oh, good morning Celeste, don't want to talk today" on these occasions.  Martires also encountered Mandour in other locations, such as the cafeteria and the bathroom.  According to Martires's testimony, Mandour would come to her work area "all the time" and "often enough."  On the other hand, Martires also testified that she had "no idea" whether Mandour

came to her work area more than once after March 2005.

      2.     Conflict between Martires and Lisa Tilum

In September 2005, Lisa Tilum succeeded King as Martires's supervisor.  Conflict immediately erupted between Tilum and Martires, and in September 2005, Martires was again hospitalized because of panic attacks.  Martires also did not like working for Tilum because, according to Martires, (1) Tilum did not understand "regulatory and compliance functions"; (2) Tilum was friendly with Mandour and Rivera; (3) Tilum did not invite Martires to meetings; (4) Tilum would list Rivera's name first on group e-mails; (5) Tilum did not authorize Martires to work overtime when she wanted, and did not satisfy Martires's inquiries about other employees' use of overtime; (6) Tilum was careless with checks; (7) Tilum would ask Martires questions too early in the morning; and (8) Tilum was overly critical of Martires's work.

On January 3, 2006, Tilum refused to continue supervising Martires because of the poor working relationship between Martires and Tilum.  After this, Martires began working directly for Sanders.

      3.     Conflict between Martires and Mike Sanders

According to Martires, Sanders was the root of her problems at DOT.  Martires claims that Sanders made Tilum her supervisor, knowing that Tilum was unqualified for the position, and to harass Martires.

Martires also claims that Sanders failed to exercise adequate caution in reviewing her time sheets; while Sanders corrected errors that gave Martires credit for extra work, he did not correct errors that caused Martires's payroll checks to be inaccurate.

According to Martires, Sanders failed to provide her with adequate assistance in

completing an application to telecommute.  Martires never completed the telecommuting application.  A white male was eventually hired to do the work Martires had hoped to do from home.

In December 2005, when Martires was out sick, Sanders needed to get a file in a locked cabinet in Martires's work area.[2]  Sanders learned that another employee, Daphne McKinney, had the key to the cabinet and some of Martires's personal keys, but McKinney refused to open the cabinet.  Sanders ordered McKinney to open the cabinet, and threatened to withhold Martires's paycheck until the cabinet was opened.[3]  McKinney gave Martires's keys to Kathleen Karwick, a human resources specialist for the DOT.  Martires called the Governor's office and her check was released less than two hours later.  According to Martires, her keys were never returned.  Karwick denies keeping the keys and other DOT employees deny having the keys.

Finally, Martires did not like working for Sanders because, according to her, he is "a known liar," he accused her of being a troublemaker, and he told one of her supervisors to monitor the length of Martires's lunch breaks.  According to Martires, other minorities have left or been forced out because of Sanders.

        B.    Overtime

Martires frequently worked overtime hours in the spring of 2004.  On May 19, 2004, King advised Mandour and other supervisors that his approval would be required before overtime could be completed.  On May 24, 2004, Mandour asked Martires, Rivera and another employee

---

[2] Martires claims that Sanders did not actually need the file.

[3] Martires had made arrangements for the check to be given to McKinney to hold until Martires' husband could pick it up.

to submit overtime requests for her to forward to King.  On June 15, 2004, King asked Mandour for a recommendation on whether Martires's overtime request should be approved.  Mandour told King that she felt that Martires was spending too much time socializing and that she could not approve Martires's request.  Martires was told to stop working overtime after June 24, 2004.  Some time later, Martires was permitted to work overtime again.

On February 17, 2005, the DOT changed its overtime policy due to budget constraints.  Under the new policy, overtime was limited to specific projects and a manager was required to submit a proposal in advance requesting permission to use overtime for one of these projects.  However, King did not understand the new policy and continued to permit Martires to work overtime.  Bob Colucci, Eugene Morris, and Richard Majka, all white men, were also permitted to work overtime on one of the projects excluded from the overtime ban.

In June 2005, Sanders clarified the new policy with King.  King informed Martires that overtime she had been working was not approved under the new policy.  Martires was compensated for her past overtime work, but was instructed to stop working overtime without authorization.

Martires complained to Sanders that the reduction of overtime was retaliation for her complaints about Mandour.  The EODO investigated Martires's complaint, but Martires refused to participate in the investigation. The EODO found that the overtime policy was related to the DOT's budget constraints.

In December 2005, the overtime elimination policy was relaxed and Sanders permitted overtime to be used for projects, including updating equipment cards.  Colluci, Morris and Majka worked on these projects during overtime.  Martires worked on these projects during the

workday, but was not permitted to use overtime to work on these projects because she had a reduced schedule for medical reasons.

      C.    <u>Other Sources of Tension</u>

      According to Martires, she also suffered from the following sources of tension in her workplace: (1) the DOT human resources department frequently lost paperwork that Martires submitted to them through interdepartmental mail; (2) Rivera was frequently out sick, causing extra work for Martires; (3) staff members slammed doors and filed grievances against one another; (4) King was involved in a physical altercation with an employee who had been accused of theft; (5) personal items were damaged or taken from Martires's desk; (6) McKinney was criticized by McKinney's supervisor in front of Martires; (7) when Martires lost a paycheck it took a long time for the check to be reissued; (8) King failed to invite Martires to meetings; (9) Rivera had a larger cubicle; (10) Martires's phone was set up so that calls were not forwarded appropriately; (11) Martires was not informed in advance that her health insurance would be terminated during an authorized unpaid vacation in July 2006, and (12) employees in other cubicles, including Mandour's husband, could overhear her conversations.

      D.    <u>Subsequent Events</u>

      At oral argument on the motion for summary judgment on November 12, 2008, the parties informed the Court that Martires was arrested and charged with violation of Conn. Gen. Stat. §§ 53a-156 (perjury), 53a-157b (false statements), and 53a-167a (interfering with an officer) on August 13, 2008, as well as being placed on administrative leave.  The arrest occurred after Martires reported in February 2008 that she found a drawing of a noose in her cubicle at work. In response to police questioning surrounding this incident, a DOT employee disclosed to a

police officer a portion of Martires's deposition testimony in this case.

II.      Summary Judgment Standard

        In a summary judgment motion, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.  When addressing a motion for summary judgment, the Court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992). Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).

        Because this is a discrimination case where intent and state of mind are in dispute, summary judgment is ordinarily inappropriate.  Carlton v. Mystic Transp., 202 F.3d 129 (2d Cir. 2000).  However, the summary judgment rule would be rendered sterile if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion. McCloskey v. Union Carbide Corp., 815 F. Supp. 78, 80 (D. Conn. 1993) (internal quotations and citations omitted).  A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 5(c)); accord Miner v. Glen Falls, 999 F.2d 655, 661 (2d Cir.1993).

-11-

A plaintiff may not rely on conclusory statements or mere contentions that the evidence in support of summary judgment is not credible. Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993);   Henry, 42 F.3d at 97 ("the plaintiff must adduce evidence consisting of more than mere conclusory or unsubstantiated statements.") Similarly, a plaintiff, as the nonmovant, may not rest "upon the mere allegations or denials" in its complaint to demonstrate the existence of a genuine issue of material fact. Fed. R. Civ. P. 56(e). Therefore, after discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. Celotex, 477 U.S. at 323.

III.     Title VII

"A plaintiff may establish a claim of disparate treatment under Title VII either (1) by showing that he has suffered an adverse job action under circumstances giving rise to an inference of discrimination on the basis of race, color, religion, sex, or national origin, or (2) by demonstrating that harassment on one or more of these bases amounted to a hostile work environment." Feingold v. New York, 366 F.3d 138, 149 (2d Cir. 2004), (citing Raniola v. Bratton, 243 F.3d 610, 617 (2d Cir. 2001)).  Under either theory, liability in a disparate-treatment case "depends on whether the protected trait . . . actually motivated the employer's decision." Raytheon Co. v. Hernandez, 540 U.S. 44, 52 (2003).

A.     Adverse Employment Action

To establish a prima facie case of discriminatory treatment based on an adverse employment action a plaintiff must show "1) that he belonged to a protected class; 2) that he was qualified for the position he held; 3) that he suffered an adverse employment action; and 4) that

-12-

the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."  Feingold v. New York, 366 F.3d at 152 (citing Collins v. New York City Transit Auth., 305 F.3d 113, 118 (2d Cir. 2002)).  Once a plaintiff has established a prima facie case, the defendant must then articulate "a legitimate, non-discriminatory reason for" the adverse employment action.  Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).  If they are able to do so, "the burden shifts back to the plaintiff to prove that discrimination was the real reason for the employment action." Id.

"Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation."  Feingold v. New York, 366 F.3d at 152 (internal quotation marks and alterations omitted).

In opposition to DOT's motion for summary judgment Martires argues that she suffered the following adverse employment actions because of her race, gender and/or national origin: (1) she was subjected to an excessive workload, (2) she was denied a deserved promotion, (3) her material responsibilities were reduced, and (4) she was denied paid administrative leave.  During her deposition, Martires also claimed that she was denied overtime.  In a supplemental memorandum in opposition to the motion for summary judgment, Martires also alleges that she suffered discrimination under the "continuing violation" doctrine, see Fitzgerald v. Henderson, 251 F.3d 345, 359 (2d Cir. 2001), when she was arrested and placed on administrative leave in 2008.

1.      Excessive Workload Claims and Reduction of Material Responsibilities

-13-

Martires has presented evidence that her workload was heavy and that her job responsibilities changed during the course of her employment.  A disproportionately heavy workload or significantly diminished material responsibilities may constitute adverse employment actions.  However, Martires has not presented evidence suggesting that her workload was disproportionate to that of other employees, or that changes in her responsibilities were material.  Moreover, the DOT has provided several legitimate, non-discriminatory reasons for the increased workload, among them that Martires <u>volunteered</u> to become an LAA permanently after working at the position temporarily and that Martires's workload was heavy because of a large-scale department-wide staff reduction.

Martires also argues that her workload was disproportionate to Rivera's.  Martires's claims that Rivera (1) was asked to continue to perform some of the job responsibilities Rivera held before becoming an LAA, (2) was permitted to telecommute during her maternity leave, (3) lacked certain job skills, and (4) was frequently absent due to illness do not constitute evidence that Martires was given a disproportionately heavy workload compared to Rivera or any other employee.  Indeed, the DOT has presented evidence that Martires was given the opportunity to switch assignments with Rivera in the spring of 2006.  Martires's claim that her workload was heavier than Rivera's is not supported by more than conclusory allegations.

Finally, Martires argues that she was "targeted" for a heavy workload because she was assigned responsibilities related to "Form E's."  However, working on "Form E's" was a responsibility of Martires's Processing Technician position.  During her deposition, Martires testified that she felt these responsibilities were important to her advancement within the DOT and that she objected when these responsibilities were assigned to a more senior male employee.

-14-

Accordingly, under the circumstances of this case, Martires's workload and changes in her responsibilities do not constitute adverse employment actions.

        2.    <u>Promotion</u>

In opposition to the DOT's motion for summary judgment, Martires argues that she was "denied a deserved promotion." Martires was transferred to work part-time in a position with a higher pay grade in June 2003. In the fall of 2003, Martires submitted a grievance requesting that she be reclassified so that she could be paid at the higher rate. In April 2004, Martires was formally reclassified. In her deposition, Martires testified that this reclassification was retroactive. Martires's comparator, Rivera, began doing LAA work earlier than Martires, but was reclassified later than Martires. Like Martires, Rivera had to file a grievance to obtain the reclassification. Although Martires testified that she felt that Mandour gave Rivera more help in completing her reclassification application, that allegation is irrelevant since Martires was reclassified and her pay was adjusted retroactively. Moreover, despite Martires' assertion that Mandour's actions surrounding Martires' reclassification were not helpful, the record shows that Mandour did take concrete actions to facilitate the reclassification and the reclassification did occur. Accordingly, the evidence presented by the parties does not suggest that this incident constituted a "denied" promotion. To the extent that the promotion was delayed, Martires has not presented evidence suggesting that it was delayed under circumstances suggesting race- or gender-based animus.

During her deposition, Martires also testified that she should have been promoted to LAS. However, Martires has not presented evidence that there was an opening for an employee at this level. Indeed, during his deposition King testified that his proposal to create this position was

-15-

rejected, and that other candidates would have been considered even if the proposal was accepted. Accordingly, this allegation also does not constitute race- or gender- based denial of a promotion by DOT.

Based on the undisputed facts, resolving all disputes and drawing all reasonable inferences in favor of Martires, no reasonable jury could find that Martires was denied a promotion for which she applied and was eligible, or that any such denial occurred under circumstances suggesting race or gender based discrimination.

3.    Paid Administrative Leave

The evidence indicates that in June and September 2004 Martires's doctor ordered that she avoid any contact with Mandour. The DOT determined that it was unable to comply with Martires' demand that she be shielded from *all* contact with Mandour in the workplace. Accordingly, Martires was required to use her allotment of medical leave during the time she spent out of work during this period.

Even assuming that the medical leave policy constitutes an adverse employment action, Martires has presented no evidence that this policy decision occurred under circumstances suggesting discriminatory animus. Martires points to white, male employees who were placed on paid leave during an investigation of alleged wrongdoing. However, these employees were not similarly situated because their absences were not related to a medical condition, and Martires has presented no evidence of other employees who received paid leave after complaining of medical conditions. Further, there is no evidence linking the decision to treat Martires's absence as requiring the use of medical leave to Mandour, or suggesting that any other employees considered Martires's race or gender in making decisions related to her. Mindful that there seem

-16-

to have been personnel issues with Martires that were unrelated to race or gender, the Court reiterates the admonition that it is not a super-personnel department.  In the absence of any evidence connecting the DOT's sick leave policy with discriminatory purpose toward Martires, the Court finds that reasonable minds could not glean from these incidents any violation of Title VII.

        4.      <u>Overtime</u>

During her deposition, Martires claimed that she was denied the opportunity to work overtime because of her race or gender.  Being denied the opportunity to work overtime may constitute an adverse employment action.  <u>Demoret v. Zegarelli</u>, 451 F.3d 140, 151 (2d Cir. 2006).   However, Martires has not presented evidence to support her claim, other than her own conclusory statements.  Moreover, the DOT has presented legitimate, non-discriminatory reasons for any denial of overtime that may have occurred.

        a.      <u>Opportunity to Work Overtime in June 2004</u>

Mandour declined to recommend that Martires be granted overtime after June 24, 2004. For the purposes of summary judgment, the Court assumes that the proximity of this decision and the alleged sexual proposition establishes a prima facie case that this decision was related to Martires's gender.  However, according to Mandour she based her decision on concerns that Martires spent too much time socializing during regular work hours.  During his deposition, King testified that he was also concerned about Martires socializing with colleagues during work hours and that he supported Mandour's decision.  Accordingly, the defendant has articulated a legitimate, non-discriminatory reason for the adverse employment action.  The plaintiff has not presented evidence to establish that this was a pretext for discrimination, or to otherwise

establish that discrimination was the real reason for the decision.

      b.      <u>Opportunity to Work Overtime in 2005</u>

Martires claims that she was denied the opportunity to work overtime in 2005 because of her race, gender, and her complaints about Mandour. However, Martires was not allowed to work overtime pursuant to a neutral, generally applied policy. While Martires proposed three white male comparators who were permitted to continue working overtime, these men are not valid comparators; they used overtime to work on specific projects that were distinct from Martires's duties. Later, after the overtime elimination policy was relaxed, the proposed comparators used overtime to complete work Martires could have done. However, Martires was not available to work overtime during this period, in part because her medical status prohibited overtime hours. Accordingly, Martires has not established a prima facie case that discriminatory animus was the reason she was not permitted to work overtime. Even if she had presented a prima facie case, the DOT's evidence of a neutral overtime policy constitutes evidence of a legitimate nondiscriminatory purpose for the overtime decision. Martires had not presented evidence to suggest that the overtime policy was a pretext or that discriminatory animus (or retaliation) was the real reason for the decision.

The defendant's motion for summary judgment is therefore granted as to the claims of adverse employment action.

      5.      <u>Events of 2008 and the "Continuing Violation" Doctrine</u>

The continuing violation doctrine is an exception to the rule under Title VII that an employment discrimination claimant file a charge with the EEOC within 300 days of the alleged discriminatory acts (or pursue other required administrative procedures within the enumerated

-18-

period from the time of the alleged discriminatory acts).  Coudert v. Janney Montgomery Scott, LLC, 2005 U.S.Dist. LEXIS 13323, *23 (D. Conn. June 30, 2005).  Under this doctrine, if a plaintiff experiences a "continuous practice and policy of discrimination," the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.  Fitzgerald v. Henderson, 251 F.3d 345, 359 (2d Cir. 2001) (quoting Gomes v. Avco Corp., 964 F.2d 1330, 1333 (2d Cir. 1992)).  "If a continuing violation is shown, a plaintiff is entitled to have a court consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred."  Id. (quoting Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 713 (2d Cir. 1996)).  The continuing violation exception is usually associated with a discriminatory policy, rather than with individual instances of discrimination.  Id.  Acts so "isolated in time . . . from each other . . . [or] from the timely allegations[] as to break the asserted continuum of discrimination" will not suffice.  Id. (quoting Quinn v. Green Tree Credit Corp., 159 F.3d 759, 766 (2d Cir. 1998)).

The events alleged in Martires's original complaint occurred between 2003 and 2006, and the majority of the discriminatory acts are alleged against Mandour between May 2004 and April, 2006.  Thus two years passed before the alleged finding of a drawing of a noose in February 2008 and the resulting arrest of Martires and her placement on administrative leave.  This latest act, even if it occurred and even if the Court were to assume that it could be attributed to the defendants, is too isolated in time from both the complaint and the allegations in the complaint to constitute a "continuing violation" under Title VII.

B.    Hostile Work Environment

"When the workplace is permeated with 'discriminatory intimidation, ridicule, and

insult,' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' . . . Title VII is violated." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (citations omitted); see Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003).  In evaluating the severity or pervasiveness of the allegedly discriminatory workplace conduct, a court must look at all of the circumstances. See Harris, 510 U.S. at 23.  A non-exclusive list of factors that courts consider in making such a determination includes "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id.

As to the frequency, "[t]here is no fixed number of incidents that a plaintiff must endure in order to establish a hostile work environment." Alfano v. Costello, 294 F.3d 365, 379 (2d Cir. 2002). The alleged incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be pervasive." Carrero v. New York City Housing Auth., 890 F.2d 569, 577 (2d Cir.1989); Tomka, 66 F.3d at 1305 n. 5 (citations omitted) ("[T]he incidents must occur in concert or with a regularity that can reasonably be termed pervasive."); Kotcher v. Rosa and Sullivan Appliance Ctr., Inc., 957 F.2d 59, 62 (2d Cir. 1992) ("The incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

The standard for evaluating a hostile work environment claim is both subjective and objective: the victim must subjectively perceive the environment to be abusive so that it actually alters the conditions of the victim's employment, and the conduct must also be so pervasive or severe that a reasonable person would find the environment abusive.  Torres v. Pisano, 116 F.3d 625, 632 (2d Cir. 1997).  The plaintiff must also show a specific basis for imputing the hostile

work environment to the employer.  Fitzgerald v. Henderson, 251 F.3d 345, 357 (2d Cir. 2001).

Although an employer is presumed responsible where the perpetrator of the harassment was the

victim's supervisor, if the supervisor's harassment did not culminate in a "tangible employment

action," an employer may avoid liability if (a) it "exercised reasonable care to prevent and correct

promptly any sexually harassing behavior, and (b) the plaintiff employee unreasonably failed to

take advantage of any preventive or corrective opportunities provided by the employer or to

avoid harm otherwise."  Id. (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998),

Faragher v. City of Boca Raton, 524 U.S. 775, 807-08 (1998)).  Those circumstances constitute

an affirmative defense on which the employer has the burden of proof.  Id.

      Although actionable harassment is not confined to sexual advances or other explicitly

sexual or racial conduct, "the plaintiff is required to establish that the harassment complained of

was based on her gender [or race]." Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d

276, 289 (2d Cir. 1998) (citations omitted); see also Alfano, 294 F.3d at 374.  Title VII is not "a

general civility code," Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998), and

"[s]imple teasing, offhand comments, or isolated incidents of offensive conduct (unless

extremely serious) will not support a claim of discriminatory harassment." Petrosino v. Bell

Atlantic, 385 F.3d 210, 223 (2d Cir. 2004).

      1.    Incidents of Harassing Conduct

      Martires claims that she was subjected to a hostile work environment on the basis of her

race and gender.[4]   She complains of the following forms of harassing conduct: (1) a single

_____

      [4] In her opposition to the motion for summary judgment, Martires argues only that she
was subjected to sexual harassment by Mandour.  However, her supplemental memorandum filed
on November 19, 2008 [Dkt. # 85] describes alleged discrimination on a "continuing violation"

sexual proposition from Martires's female supervisor in May 2004; (2) two incidents of
intentional bumping by her then former supervisor in October and November 2004;[5] (3)
occasional incidents of Martires's former supervisor rubbing against her while walking through a
narrow hallway behind Martires's desk; (3) occasional incidents of Martires's former supervisor
greeting her in the workplace; and (4) generally poor working conditions.

Considering the totality of Martires's work environment, and resolving all disputed issues
of fact in favor of Martires, the Court finds that Martires has not presented evidence of severe
and pervasive sexual or race based harassment.  While completely inappropriate (if true), and
obviously offensive to Martires, Mandour's sexual proposition was an isolated incident, and
alone was not sufficiently severe to alter the conditions of Martires's employment.  Compare
Quinn, 159 F.3d 768 (finding an appreciative comment about the plaintiff's buttocks and a
deliberate touching of her breasts insufficient as a matter of law to alter the terms and conditions
of employment) and Cruz v. Oxford Health Plans, Inc., 2008 WL 509195, at *7 (S.D.N.Y. 2008)
(sexual proposition by person to whom plaintiff's supervisor reported linking acquiescence to
career advancement insufficient) with Torres v. Pisano, 116 F.3d 625, 632 (2d Cir. 1997) ("A
reasonable woman would find her working conditions altered and abusive when her own
supervisor repeatedly referred to her as a ". . . [sexually offensive term]," suggested that she was
in the habit of performing oral sex for money, ridiculed her pregnancy, commented on her
anatomy and his desire to have sex with her, and allowed friends of his who visited him at the

theory as a result of an incident involving a drawing of a noose, which the Court understands to
be an allegation of animus based on race.

[5] Martires has not presented evidence from which the Court can make an inference about
the force of the "bumps."

office to make crude sexual remarks about her.") and Distasio v. Perkin Elmer Corp., 157 F.3d 55, 62 (2d Cir. 1998) (citations omitted) (holding that three instances in which co-worker exposed genitals combined with sexual proposition and other incidents prevented summary judgment).

Before Mandour's supervisors had even learned of the incident, they took reasonable steps to separate Mandour and Martires. Although Martires continued to encounter Mandour in and around her workplace, such encounters were episodic. After Martires reported an incident of unwanted physical contact with Mandour, and the past sexual proposition, the DOT redoubled its efforts to separate Mandour and Martires.

Although Martires does not argue in opposition to the DOT's motion for summary judgment that her generally poor working conditions, or tension between herself and other supervisors amounted to gender or race based harassment, Martires did make such claims in her deposition. The Court notes that Martires has failed to establish a connection between her general working conditions and her race or gender, or between the gender-based incidents and those working conditions. Accordingly, and mindful of the Second Circuit's admonition that "[the Court's] role is to prevent unlawful hiring practices, not to act as a superpersonnel department that second guesses employers' business judgments," Alfano, 294 F.3d at 377 (quoting Byrnie v. Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001)), the defendant's motion for summary judgment is granted as to the claim of hostile work environment.

    2.    Faragher/Ellerth Defense

The defendant argues that an additional reason to grant summary judgment is that the DOT exercised reasonable care to prevent and to promptly correct any sexually harassing

behavior, while Martires unreasonably failed to take advantage of the preventive or corrective

opportunities provided by DOT to avoid harm, satisfying the requirements of the Faragher/Ellerth

affirmative defense to claims of Title VII violations.  See Faragher v. City of Boca Raton, 524

U.S. 775 (1998), Burlington Indus. Inc. v. Ellerth, 524 U.S. 742 (1998).  This defense is not

available "when the supervisor's harassment culminates in a tangible employment action, such as

discharge, demotion or undesirable reassignment."  Faragher, 524 U.S. at 808.  Because summary

judgment is appropriate for the several reasons described in this ruling, the Court declines to base

its grant of summary judgment on the Faragher/Ellerth defense even though the record includes

evidence to support the applicability of the defense in this case, including the internal reviews of

Martires' complaints and Martires' unreasonable failure to submit several of her complaints to

DOT using its established procedures, to file additional CHRO complaints, or to seek permission

to sue from the Office of the Claims Commissioner under Conn. Gen. Stat. § 4-160 (see below).

C.    Retaliation

Martires claims that the DOT retaliated against her after she complained about Mandour

and filed a complaint with the CHRO.

According to the Second Circuit:

> To establish that an employer has unlawfully retaliated for an employee's having
> pursued a discrimination action, the employee must show that he was engaged in a
> protected activity; that the employer was aware of that activity; that there occurred an
> employment action adverse to the employee; and that there existed a causal
> connection between the protected activity and the adverse employment action.

Hollander v. American Cyanamid Co., 895 F.2d 80, 85 (2d Cir. 1990).  In the context of a

retaliation action an adverse employment action must be "materially adverse," in that it would

"dissuade[ ] a reasonable worker from making or supporting a charge of discrimination."

-24-

<u>Burlington Northern & Santa Fe Railway Co. v. White</u>, 548 U.S. 53 (2006).  While "the antiretaliation provision [of Title VII]. . . is not limited to discriminatory actions that affect the terms and conditions of employment . . . [a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."  <u>Id.</u> at 64, 68.

As with disparate treatment, once a plaintiff has satisfied his or her prima facie burden, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory basis for its action.  <u>See</u> <u>Feingold v. New York</u>, 366 F.3d 138, 157 (2d Cir. 2004).  The burden then shifts back to the plaintiff  "to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation."  <u>Raniola v. Bratton</u>, 243 F.3d 610, 625 (2d Cir. 2001).

While Martires has identified a number of circumstances that made her workplace difficult, most cannot reasonably be considered more than "petty slights or minor annoyances." Martires's claims that she was denied a promotion to LAS, that she was denied overtime, and that she was required to use sick time in September 2004 are possible exceptions.[6]  However, as set forth above, Martires has not presented evidence that there was an opening for an LAS, and has not presented evidence that she was singled out for the overtime reduction policy.  Further, in September 2004 when she was placed on involuntary medical leave, Martires had not yet engaged in any protected activity; while Martires had accused Mandour of harassing her she had

---

[6] Martires also claims that an "integral part" of her job was removed, but has not provided any evidence to support this claim, or context to evaluate it.  While her brief in opposition to the motion for summary judgment references a portion of Sanders's deposition, neither party provided this excerpt.

not alleged that this harassment was based on her race or gender.  Accordingly, Martires cannot

establish any causal connection between these possible adverse actions and any protected activity

and the defendant's motion for summary judgment is granted.[7]

IV.     Claims Under 42 U.S.C. Section 1981 and State Law

     A.     Section 1981

The defendant argues that summary judgment must be granted as to all claims against the

DOT under 42 U.S.C. § 1981.  Section 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right
> in every State and Territory to make and enforce contracts, to sue, be parties, give
> evidence, and to the full and equal benefit of all laws and proceedings for the
> security of persons and property as is enjoyed by white citizens, and shall be
> subject to like punishment, pains, penalties, taxes, licenses, and exactions of every
> kind, and to no other.

42 U.S.C. § 1981.

In Jett v. Dallas Independent School District, the Supreme Court held that "the express

'action at law' provided by § 1983 for the 'deprivation of any rights, privileges, or immunities

secured by the Constitution and laws,' provides the exclusive federal damages remedy for the

violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor."  491

U.S. 701, 735 (1989); see Anderson v. Conboy, 156 F.3d 167, 176 n.17 (2d Cir.1998) (citing Jett,

491 U.S. at 733).  The Court finds that Jett applies to Martires's § 1981 claim against the DOT.

See Burbank v. Attorney General of Connecticut, 240 F. Supp. 2d 167, 173-175 (D. Conn. 2003).

---

     [7] Even if the Martires's other workplace circumstances, alone or combined, would be
enough to dissuade a reasonable worker from making a charge of discrimination, Martires has
not presented evidence establishing a causal connection between her work environment and her
complaints about Mandour.  Indeed, the evidence indicates that many employees found it
difficult to work at the DOT during this period.

Furthermore, even if Martires had pled a cause of action pursuant to 42 U.S.C. § 1983, her claim would be barred by the doctrine of sovereign immunity embodied in the Eleventh Amendment.  In order to be subject to suit in federal court, a state must expressly and unambiguously waive its Eleventh Amendment immunity, or Congress must clearly and unmistakably express its intention to abrogate the immunity in the language of the particular statute.  Port Authority Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 304-05 (1990).  Courts have held that Congress has not abrogated the state's immunity from suit under 42 U.S.C. §§ 1981 or 1983, see, e.g., Daisernia v. New York, 582 F. Supp. 792, 799 (N.D.N.Y. 1984), and Connecticut has not waived its sovereign immunity under those statutes.  Banerjee v. Roberts, 641 F. Supp. 1093, 1098 (D. Conn. 1986).

Finally, Martires failed to respond to the defendant's argument that her claims under Section 1981 are barred by the Eleventh Amendment.[8] On this basis alone, the Court could consider this claim abandoned.  See, e.g., Coger v. Connecticut Dep't of Administrative Svcs., 309 F.Supp.2d 274, 280 (D. Conn. 2004), aff'd, Coger v. State Dep't of Pub. Safety, 143 Fed.Appx. 372 (2d Cir. 2005).

Thus, summary judgment is granted as to all claims against the DOT under this statute (Count Two).

--------

[8]Martires's only mention of the defendant's Eleventh Amendment argument is found in a footnote to her Corrected Motion in Opposition to Defendant's Motion for Summary Judgment, in which she concedes that "the issue of Eleventh Amendment sovereign immunity" is a legal, not a factual, dispute.

      B.      <u>State Law Claims (Negligent and Intentional Infliction of Emotional Distress,</u>

          <u>Negligent Supervision)</u>

Because none of the federal claims brought in this action survive the motion for summary

judgment, the Court declines to exercise supplemental jurisdiction over the state law claims.

VI.    <u>Conclusion</u>

For the reasons set forth above, the motion for summary judgment [Dkt. # 46] is

**GRANTED**.

**SO ORDERED** this  22nd day of January 2009, at Hartford, Connecticut.

          **/s/ Christopher F. Droney**
          **CHRISTOPHER F. DRONEY**
          **UNITED STATES DISTRICT JUDGE**